# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

THOMAS SANDERS,

      Plaintiffs,

vs.                                    No. CIV 08-0895 JB/WPL

JOSEPH WILLIAMS, Secretary of New Mexico
Department of Corrections, ROBERT ULIBARRI,
Warden, Southern New Mexico Correctional
Facility, MICHAEL HEREDIA, Deputy Warden,
Southern New Mexico Correctional Facilities,
DWAYNE SANTISTEVAN, JOE ROMERO,
LIEUTENANT MOORE, MANUEL MARTINEZ,
LAWRENCE JARAMILLO, JOHN DOE 1-10,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary Judgment

and Memorandum in Support Thereof on All of Plaintiff's Federal Claims Based on Plaintiff's

Failure to Exhaust His Administrative Remedies as Required by the Prison Litigation Reform Act,

filed June 22, 2009 (Doc. 28)("Motion for Summary Judgment"). The Court held a hearing on

August 10, 2009. The primary issue is whether Plaintiff Thomas Sanders exhausted his

administrative remedies before filing his petition for a writ of habeas corpus in federal court.

Because the Court finds that Sanders successfully exhausted administrative remedies as to two of

the four counts in his Complaint, the Court grants in part and denies in part the Defendants' motion

for summary judgment.

## FACTUAL BACKGROUND

Sanders was convicted in the New Mexico state courts of "first-degree murder, conspiracy

to commit first-degree murder, tampering with evidence, conspiracy to commit tampering with evidence, attempted fraud greater than $20,000, fraud greater than $2,500, and conspiracy to commit fraud greater that $2,500." State v. Sanders, 117 N.M. 452, 454, 872 P.2d 870, 872 (1994). He is serving a sentence of "life imprisonment plus twenty-two and one-half years." Id. at 456, 872 P.2d at 874. He has been held in the custody of the New Mexico Department of Corrections ("NMDOC") since 1991. See Complaint Under 42 U.S.C. Section 1983 and the New Mexico Tort Claims Act for the Recovery of Damages and Other Equitable Relief ¶ 2, at 2, filed October 10, 2008 (Doc. 1) ("Complaint"). Each of the Defendants is, or was at one time, an NMDOC employee. See Complaint ¶¶ 10-17, at 4-11.

In 1997, Sanders, who is "an enrolled member of the Santa Ana Pueblo," id. ¶ 9, at 4, was "identified as a member of an [Hispanic] prison gang known as the Syndicato de Nuevo Mexico ("SNM")," id. ¶¶ 2 & 24, at 2, 13. He contends that this identification was erroneous, and was made "in retaliation for exercising his right of access to court." Id. ¶ 2, at 2.

Sanders states that, on April 1, 1997, he spoke with Defendant Dewayne Santistevan, who at that time was "employed as a Lieutenant in the Security Threat Group at the Central New Mexico Correctional Facility," and who told Sanders that the NMDOC "possessed photographs and correspondence suggesting" that Sanders was a member of the SNM. Complaint ¶ 24, at 13. Sanders denied his involvement in the gang to Santistevan and to Defendant Lawrence Jaramillo, another "member of the Security Threat Group" who was "directly responsible for the hiring, training and supervision of all Security Threat Group correctional officers assigned to the Southern New Mexico Correctional Facility" ("SNMCF"), id. ¶ 17, at 11, contending that, "as an enrolled member in the Santa Ana Pueblo, he could not belong to an Hispanic prison gang," id. ¶ 25 at 13-14. Sanders contends that he showed prison officials, including Santistevan, "that he did not have any

SNM gang tattoos, that there was no SNM gang graffiti in his cell, and that his only connection to the SNM was through legal work with a fellow inmate." Id. ¶ 26, at 14.  In October 2004, Sanders was transferred to the SNMCF and

> placed in Housing Unit 1-A, B Pod, cell 103–a sixteen unit housing Pod where all of the other fifteen inmates were verified members of the SNM prison gang.  After being housed in B Pod, Mr. Sanders repeatedly tried to warn Defendants Heredia, Moore and Martinez that his life was in danger because he was being housed in a Pod where every other resident was a member of the SNM, even though he himself was not a member of the prison gang.  However, despite these consistent complaints, Mr. Sanders was always told that officials at the New Mexico Department of Corrections, including Defendants Ulibarri and Jaramillo, were under orders to keep Mr. Sanders in B Pod of Housing Unit 1-A.

Complaint ¶ 28, at 14-15.  After a positive classification review in early November 2006, Sanders requested transfer to a lower-security-level prison facility, "which would be consistent with his low classification score." Id. ¶ 29, at 15.  But "Defendants Ulibarri, Heredia, Santistevan and Jaramillo, who consistently claimed that they were acting pursuant to orders from the Security Threat Group, under the direction of Defendants Santistevan and Moore," ignored his requests. Id.  On November 12, 2006, at around 7:00 p.m.,

> three inmates entered [Sanders'] cell armed with homemade knives (or "shanks") and repeatedly stabbed him, stating that they did not want Native Americans in "their" pod and that Mr. Sanders did not belong in B Pod with members of the Syndicato of Nuevo Mexico. [] The assault on Mr. Sanders occurred in the presence of at least two correctional officers who were assigned to maintain security in the B Pod of Housing Unit 1-A, but these correctional officers took no action to intervene or prevent the assault on Mr. Sanders.

Complaint ¶¶ 30-31, at 16.  The Defendants confirm that "[a]ll three inmates . . . [were] suspected or validated members of the [SNM] prison gang."  Declaration of Michael Heredia ¶ 8, at 2, made June 12, 2009 (attached to Doc. 28 as Exhibit B)("Heredia Decl.").  Defendant Michael Heredia, SNMCF's Deputy Warden, conducted an investigation "on what had occurred," and he also asked the State Police to conduct "an investigation of the incident."  Id. ¶ 4, at 1.

-3-

After the stabbing, prison officials transported Sanders to a local hospital, where he was examined and his seven stab wounds were sutured.  See Complaint ¶¶ 32, 34, at 16.  Upon his return to the SNMCF at around 11:00 p.m., Sanders was placed in a cell in involuntary segregation that "had no mattress and he was stripped of his clothes, towels and blankets.  Despite his persistent requests for clothes, a blanket, a towel or a mattress, [he] . . . remained in the cell without clothes or linens for more than five hours."  Id. ¶ 35, at 17.

Sanders has had access to NMDOC Policies and Procedures relating to grievances since 1991.  See Motion for Summary Judgment, Exhibit H-2 ("Orientation" sheet from NMDOC's "Main Facility" acknowledging Sanders' receipt of packet that includes copy of "Grievance Procedures" and signed by Sanders on December 20, 1991); Motion for Summary Judgment Exhibit H-5 ("Orientation Packet" sheet from SNMCF acknowledging Sanders' receipt of the packet containing "Inmate Grievances" information and signed on April 4, 2004).  At the time SNM gang members assaulted him, the policy regarding inmate grievances was contained in policy numbers CD-150500 and CD-150501.  See Deposition of Ralph Casaus, NMDOC's Grievance Appeal Coordinator, at 18-21 (attached to Motion for Summary Judgment as Exhibit J)("Casaus Depo.").  Under these policies, a grievance is defined as "a written complaint by an inmate on the inmate's behalf regarding a policy applicable within an institution, a condition in an institution, or an incident occurring within an institution."  CD-150500 at 2, ¶ E (attached to the Motion for Summary Judgment as Exhibit I) (revised as of February 27, 2008).[1]

An inmate could file a grievance regarding the application of prison policies and rules,

---

[1] Casaus authenticated the Department's Grievance Policies and Procedures at his deposition.  See Casaus Depo. at 20 (attached to Motion for Summary Judgment as Exhibit J).  While citations to provisions of the Policies and Procedures herein are to the 2008 version, unless otherwise stated, the same provisions existed in the earlier versions, but other section designations may be different.

individual employee actions, "perceived reprisal for . . . participation in the grievance process," or "[a]ny other matter relating to conditions of care or supervision within the authority of the [NMDOC] . . . except as noted herein." Id. at 5, ¶ D(1)(a)-(d).  Some matters, however, were not grievable, including "[a]ny matter over which the Corrections Department has no control, for example . . . tort claims" and "[a]ny matter involving a classification decision."  CD-150500 at 6, ¶ D(2)(a),(d).  If an inmate filed a grievance on an issue that is properly the subject of a tort claim, the inmate Grievance Officer would advise the inmate that the issue is not grievable and that the inmate must file a Tort Claims Notice under the New Mexico Tort Claims Act, NMSA 1978, § 41-4-1 through 41-4-27 ("NMTCA").  See Casaus Depo. at 24-25 (attached as Exhibit A to Doc. 29, Plaintiff's Response to Motion for Summary Judgment).

NMDOC's grievance policy encouraged inmates to "resolve grievances at the lowest possible level.  Informal resolution is encouraged." CD-150500 at 6, ¶ E.   In fact, inmates were "expected to attempt to resolve the grievance . . . informally through discussion with the person . . . responsible for the incident, giving rise to the complaint."  CD-150501 at 1, ¶ A(1) (attached to the Motion for Summary Judgment as part of Exhibit I).  If resolution by informal discussion failed, NMDOC's policy required the  inmate to "file an informal complaint . . . within five calendar days from the date of the complaint," "explain[ing] in detail his/her complaint," and addressing the complaint to the Unit Manager or the Chief of Security or their designees.  Id.  If the Unit Manager or Chief of Security failed to respond or to resolve the informal grievance "within five working days from receipt" of the informal complaint, the inmate could file a signed "formal grievance within 20 calendar days of the date of the complaint," attaching the "nonresolved complaints" to the formal grievance and submitting it to the facility's Grievance Officer.  Id. and ¶ A(2), (3).

The inmate had to "complete a separate grievance form for each issue grieved," "even

-5-

though the problem may be shared with other inmates," and had to "state what reasonable relief is

being requested as a solution to any grievance," or the Grievance Officer would return the grievance

"to the inmate for completion."  CD-150501  at 2, ¶ A (6), (7). Under the policies, "[n]o more than

90 working days will pass from the filing of a grievance by an inmate to the final decision." CD-

150500 at 7, ¶ G(1).  Further, "in the event the grievance is not disposed of within the time limit,

the inmate shall be deemed to have exhausted administrative remedies for that specific complaint.

The grievance is not automatically granted."  Id. ¶ G(5)

Sanders asserts that he had numerous oral conversations with Heredia, Santistevan,

Defendant Lieutenant Moore, Defendant Robert Ulibarri, SNMCF's Warden, and Defendant Joseph

Williams, Secretary of NMDOC concerning his allegedly improper housing with SNM gang

members and his designation as a suspected SNM gang member.   See Plaintiff's Answer to

Defendants' First Set of Interrogatory No. 2 (attached to the Motion for Summary Judgment as

Exhibit C).  After he was attacked, Sanders filed an "Inmate Informal Complaint" on November 20,

2006, which identified Heredia and Security Threat Intelligence Unit ("STIU") Administrator Joe

Romero as the "person to whom the complaint was filed against."  Sanders' Informal Complaint at

1 (attached to Plaintiff's Response (Doc. 29) as Exhibit H).   The complaint stated: "I've been

exposed to risk of bodily harm since 1998 when I was falsely identified as an SNM gang member.

I want Mr. Heredia and STIU Administrator to accept liability for their wrongful acts."  Id.  James

Thomas, an NMDOC employee, investigated the informal complaint and spoke with Warden

Heredia, who told Thomas that "the incident was still under investigation."  Id. at 2.  Thomas

returned the informal complaint to Sanders on November 28, 2006, checking a box stating:

"Recommend formal grievance."  Id.  Accordingly, Sanders filed a Formal Inmate Grievance on

November 28, 2006.  See Sanders' Inmate Grievance (attached to Plaintiff's Response (Doc. 29) as

Exhibit F).  In the grievance, Sanders states:

> Since 1998 the NMCD STIU Administrator Lawrence Jaramillo has falsely
> identified me as an SNM gang member.  I've repeatedly told the administration at
> SNMCF that I am not an SNM gang member.  I've told various members of the STIU
> staff at SNMCF that I'm not an SNM gang member.  Relief requested is for the
> NMCD to accept liability for their wrongful acts and remove the status of suspected
> SNM member off of my STIU file.

Id. at 1.  He attached a sheet to his formal grievance listing all the prison staff whom he had told he

was "not an SNM gang member."  Sanders' Nov. 28, 2006 Inmate Grievance at 3.  The Grievance

Officer accepted the grievance for consideration on November 30, 2006, see id. at 1; however, it was

ultimately returned to Sanders on December 20, 2006, with instructions that it was being "referred

as an appeal" of his classification.  Id. at 2.

Sanders filed an "Appeal of Level V and Level VI Placement or Retention Decision" on

December 18, 2006.  Sanders' Appeal at 1 (attached to Plaintiff's Response as Exhibit G).  In the

Appeal, Sanders states:

> I've been placed in Level VI for being assaulted.  I do not meet the criteria for being
> placed in Level VI.  I score 1 point on the reclassification scoring form with clear
> conduct for over 36 months.  In my previous two committees at SNMCF I was
> referred to Level III placement for CNMCF.

Sanders' Appeal at 1.  The classification appeal was denied on April 20, 2007.  See id. at 2.  There

is no dispute that improper classification by the STIU was not a grievable issue at the time of

Sanders' assault.  See Casaus Depo. at 28-29 (attached to Plaintiff's Response as Exhibit A); CD-

150500 at 6, ¶ D(2)(d) (stating that "any matter involving a classification decision" is "not

grievable").

Sanders filed a formal notice of claim under the NMTCA on January 8, 2007, by and through

his current counsel of record, advising the NMDOC that he intended to pursue a legal claim for the

assault by SNM gang members.  See Sanders' Tort Claims Notice at 1 (attached to Plaintiff's

Response as Exhibit I).  The State's Risk Management Division ("RMD") acknowledged receipt of Sanders' Notice of Claim and indicated that the office was conducting an investigation into the circumstances pertaining to the incident.  See Letter from John Gohrick to Plaintiff's Counsel (dated January 24, 2007) (attached to Plaintiff's Response as Exhibit J).  On March 4, 2007, William Johnson of Select Organization and Administrative Resource Services ("S.O.A.R.S."), which the RMD retained to "follow up" on Sanders' tort claim, wrote to Sanders' attorney requesting a HIPPA-compliant medical release and the opportunity to interview Sanders about the incident.  See Letter from William Johnson to Plaintiff's Counsel at 1 (dated March 2, 2007) (attached to Plaintiff's Response as Exhibit K).

The RMD completed its investigation into the assault on Sanders by June 19, 2007, and determined that there was "no negligence or liability on the part of the Department of Corrections or its employees."  Letter from Roger E. Montoya to Plaintiff's Counsel at 1 (dated June 19, 2007) (attached to Plaintiff's Response as Exhibit L).

Sanders filed this suit, which is for money damages under 42 U.S.C. § 1983 and the NMTCA on October 1, 2008.  See Complaint ¶ 1, at 1.  The Complaint alleges four causes of action, with each brought under both the state and federal constitutions and requesting relief under § 1983 and/or the NMTCA.  Count I is for "Cruel and unusual punishment: Deliberate indifference to a known risk of harm."  Complaint at 17.  The essence of this count is that Sanders was subjected to a known risk of harm when the Defendants wrongly identified him as an SNM gang member, placed him in a housing unit at the SNMCF where every other member of the Pod was a member of the SNM gang and where these gang members were predatory and violent, and where they repeatedly ignored his requests to correct the dangerous situation while knowing that inmate-to-inmate violence between gang and non-gang members was rampant at the facility and that gang members were placed into

a single unit for that reason.  <u>See</u> Complaint ¶¶ 44-45, at 19.

Count II is for "Deliberate indifference to serious medical-care needs."  Complaint at 20. The essence of the count is that Sanders did not receive clothing, bedding, or medical attention after he was returned to SNMCF from the hospital on November 12, 2006.  <u>See</u> <u>id.</u>  ¶¶ 49-50.

Count III is for "Official retaliation for the exercise of protected constitutional rights." Complaint at 21.  The essence of this Count is that the NMDOC officials purposefully misidentified Sanders as a member of SNM as punishment for his exercise of his constitutional right to petition the government for redress of grievances and for agreeing to testify on behalf of other inmates who had grievances against the NMDOC or its facilities.  <u>See</u> Complaint ¶¶ 57-58, at 22.

Count IV is for "Negligent and deliberately indifferent supervision, retention, and training." Complaint at 22.  The essence of this Count is that Williams, Santistevan, Jaramillo, and Ulibarri negligently retained, trained, and supervised other employees who caused or allowed the events giving rise to the circumstances forming the basis of Counts I, II, and III.  <u>See</u> Complaint ¶¶ 59-66, at 22-23.

## PROCEDURAL BACKGROUND

The Defendants have submitted their motion for summary judgment and memorandum in support thereof, requesting dismissal of all of Sanders' claims insofar as they have been brought under § 1983.  <u>See</u> Doc. 28.  The basis for the motion is the contention that Sanders failed to comply with the requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA"), in that he allegedly failed to properly employ and exhaust the NMDOC's grievance procedures for any of the federal claims lodged in this suit.

On July 10, 2009, Sanders filed his Responses to Defendants' Motion for Summary Judgment Regarding the Exhaustion of Administrative Remedies.  <u>See</u> Doc. 29.  Defendants

submitted their reply on July 17, 2009.  <u>See</u> Doc. 30.  The Court held a hearing on the motion for

summary judgment on August 10, 2009.  At the hearing, Ronald Gould, the Defendants' attorney,

agreed that the standard for deciding the issue whether a prison has properly grieved an issue is not

to look at the precise legal terms in which he couched the complaint, but to look at the facts he

alleges and determine whether the prison official should have been put on notice of the nature of his

claim.  See Transcript of Hearing at 10:20-25 (taken August 10, 2009)("Tr.")(Gould).[2]  He also

admitted that, if this case is about classification and about misidentification with a gang and not

about damages from a stabbing, the Defendants would concede that he has exhausted his other

remedies.  <u>See</u> Tr. at 15:9-17:4 (Court, Gould).

### STANDARD FOR DECIDING MOTIONS FOR SUMMARY JUDGMENT

A court may grant summary judgment only when "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2).  <u>See</u>

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986) (citing former version of rule 56).  When an

affirmative defense is raised in a motion for summary judgment, the defendant must demonstrate

that "no disputed material fact exists regarding the affirmative defense asserted."  <u>Hutchinson v.</u>

<u>Pfeil</u>, 105 F.3d 562, 564 (10th Cir. 1997).  <u>See</u> <u>Hesterlee v. Cornell Cos. Inc.</u>, No. 09-6054, 351 Fed.

Appx. 279, 2009 WL 3438548, *1 (10th Cir. Oct. 27, 2009)(applying <u>Hutchinson v. Pfeil</u> to case

in which prison officials moved for summary judgment, contending that inmate had failed to exhaust

administrative remedies regarding his claim that guards had beaten him, thereby violating his Eighth

Amendment rights under § 1983). "If the defendant meets this initial burden, the plaintiff must then

---

[2] The Court's citations to transcripts of hearings refer to the court reporter's original, unedited versions. Any final transcript may contain slightly different page and/or line numbers.

demonstrate with specificity the existence of a disputed material fact." <u>Hutchinson v. Pfeil</u>, 105

F.3d at 564.

## LAW REGARDING EXHAUSTION OF REMEDIES UNDER THE PLRA

The PLRA states, in pertinent part: "No action shall be brought with respect to prison

conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any

jail, prison, or other correctional facility until such administrative remedies as are available are

exhausted." 42 U.S.C. § 1997e(a).  "The PLRA's exhaustion requirement applies to all inmate suits

about prison life, whether they involve general circumstances or particular episodes, and whether

they allege excessive force or some other wrong." <u>Porter v. Nussle</u>, 534 U.S. 516, 532 (2002).

> Once within the discretion of the district court, exhaustion in cases covered by §
> 1997e(a) is now mandatory.  All "available" remedies must now be exhausted; those
> remedies need not meet federal standards, nor must they be "plain, speedy, and
> effective."    Even when the prisoner seeks relief not available in grievance
> proceedings, notably money damages, exhaustion is a prerequisite to suit.  And
> unlike the previous provision, which encompassed only § 1983 suits, exhaustion is
> now required for all "action[s] . . . brought with respect to prison conditions,"
> whether under § 1983 or "any other Federal law."

<u>Porter v. Nussle</u>, 534 U.S. at 524(citations and some internal quotation marks omitted).  Congress

enacted the exhaustion provisions intending

> to reduce the quantity and improve the quality of prisoner suits . . . . Congress
> afforded corrections officials time and opportunity to address complaints internally
> before allowing the initiation of a federal case.  In some instances, corrective action
> taken in response to an inmate's grievance might improve prison administration and
> satisfy the inmate, thereby obviating the need for litigation.  In other instances, the
> internal review might filter out some frivolous claims.  And for cases ultimately
> brought to court, adjudication could be facilitated by an administrative record that
> clarifies the contours of the controversy.

<u>Id.</u> at 524-25.  A prisoner may not satisfy PLRA's exhaustion requirements "by filing an untimely

or otherwise procedurally defective administrative grievance or appeal." <u>Woodford v. Ngo</u>, 548

U.S. 81, 83-84 (2006).  "[E]xhaustion requirements are designed to . . . give the agency a fair and

full opportunity to adjudicate their claims." Id. at 90. "[P]roper exhaustion of administrative remedies [] means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." Id. (italics in original, citation and internal quotation marks omitted).   Requiring proper exhaustion

> gives prisoners an effective incentive to make full use of the prison grievance process and accordingly provides prisons with a fair opportunity to correct their own errors. This is particularly important in relation to state corrections systems because it is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.

Id. at 94 (internal quotation marks omitted).

The nature and extent of information an inmate must provide in his administrative grievance to satisfy PLRA's exhaustion requirement depends upon what the state's administrative system requires.  The Court in Porter v. Nussle made clear that what is required for an inmate to exhaust prison-grievance proceedings is not the same as the "[p]roof requirements once a case is in court," such as "what injury . . . a plaintiff [must] allege and show; [and] what mental state . . . a plaintiff [must] plead and prove." Porter v. Nussle, 534 U.S. at 529.  In its most recent analysis of exhaustion of prison remedies, the Supreme Court of the United States made several holdings.  First, it held that an inmate does not have "to allege and demonstrate exhaustion in his complaint." Jones v. Bock, 549 U.S. 199, 203 (2007).  The Supreme Court also held that courts should not "permit suit only against defendants who were identified by the prisoner in his grievance" unless the state's prison-grievance procedure requires the inmate to provide that information.  Id.   The Court further held that, if "the prisoner fails to satisfy the exhaustion requirement as to any single claim in his complaint" the court should dismiss only the unexhausted claims instead of "the entire action." Id.

In addressing "the level of detail required in a grievance to put the prison and individual

officials on notice of the claim," the Supreme Court held that "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." 549 U.S. at 218.  Because the prison's grievance procedures in Jones v. Bock made "no mention of naming particular officials," the Supreme Court held that "the Sixth Circuit's rule imposing such a prerequisite to proper exhaustion is unwarranted."  Id.

Thus, it is now clear that "'the rules [for exhaustion] come from the prison grievance systems themselves -- state law for state prisons, federal administrative law for federal prisons.'"  Kikumura v. Osagie, 461 F.3d 1269, 1282 (10th Cir. 2006)(quoting Strong v David, 297 F.3d 646, 649 (7th Cir. 2003)(holding that "grievances must contain the sort of information that the administrative system requires"), overruled in part on other grounds by Bell Atlantic v. Twombly, 550 U.S. 544, 563 (2007).  As long as an inmate timely submits all the information in his grievance that the prison requires, "a grievance will satisfy [PLRA's] exhaustion requirement so long as it is not so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally."  Kikumura v. Osagie, 461 F.3d at 1283 (internal quotation marks omitted).  Applying both Jones v. Bock and Kikumura v. Osagie, the Tenth Circuit has held:

> Identifying the exact steps a prisoner must take to exhaust administrative remedies presents "a choice-of-law issue," derived from the requirements of "the prison grievance systems themselves."  Kikumura v. Osagie, 461 F.3d 1269, 1282 (10th Cir. 2006)(quotations omitted);  see also Jones v. Bock, 549 U.S. 199, 127 S. Ct. 910, 923, . . . (2007)("[I]t is the prison's requirements . . . that define the boundaries of proper exhaustion.").
>
> PLRA exhaustion is an affirmative defense.  See Jones, 127 S. Ct. at 921. We follow our usual practice with respect to affirmative defenses, and address only those arguments related to exhaustion that have been raised by defendants.  See Freeman v. Watkins, 479 F.3d 1257, 1259-60 (10th Cir. 2007).

Howard v. Waide, 534 F.3d 1227, 1243-44 (10th Cir. 2008).  "[T]he burden of proof for the

exhaustion of administrative remedies in a suit governed by the PLRA lies with the defendant."

Roberts v. Barreras, 484 F.3d 1236, 1241 (10th Cir. 2007).

In determining what details a grievance had to bring to the prison's attention to exhaust an

inmate's Eighth-Amendment claim for deliberate indifference, the Tenth Circuit rejected the

Defendants' contention that the inmate's

> "claim" for deliberate indifference is unexhausted because he did not request
> monetary damages during the grievance process. . . . "[O]ne 'exhausts' processes,
> not forms of relief.' Booth v. Churner, 532 U.S. 731 . . . (2001). Moreover,
> monetary damages are not available through the CDOC grievance process. See
> Colo. Dep't of Corr. Reg. 850-04 § III(F)(providing that "damages for pain and
> suffering, and exemplary or punitive damages are not remedies available to
> offenders"). PLRA does not require a prisoner who otherwise complies with the
> grievance process to add a futile request for a remedy that is, by the prison's own
> terms, unavailable.

Howard v. Waide, 534 F.3d at 1244 (holding that an inmate had sufficiently exhausted his

administrative remedies on his Eighth-Amendment claim for deliberate indifference by filing and

pursuing a grievance warning "prison officials that the 2-11 Crew presented a risk to Howard's

personal safety so long as he remained in the East side of Sterling" but holding that he had not

exhausted remedies for separate events that occurred later, and for which he did not file a grievance).

Thus, the PLRA requires a prisoner seeking only money damages through a lawsuit brought

under federal law to "complete a prison administrative process that could provide some sort of relief

on the complaint stated, but no money" before filing suit. Booth v. Churner, 532 U.S. 731, 734

(2001). "[E]ven where the 'available' remedies would appear to be futile at providing the kind of

remedy sought, the prisoner must exhaust the administration remedies available." Patel v. Fleming,

415 F.3d 1105, 109 (10th Cir. 2005)(citing Jernigan v. Stuchell, 304 F.3d 1030, 1032 (10th Cir.

2002). Once the inmate has exhausted the administrative process on the relief the prison can give,

the inmate has satisfied the exhaustion requirement for his prison-conditions claim. See Ross v.

County of Bernalillo, 365 F.3d 1181, 1187 (10th Cir. 2004)(holding that, because prison "was unable to do anything more in response to" the inmate's complaint because neither "money damages or any other retrospective relief was available through the prison's grievance process," the inmate "was required to do no more in order to exhaust his administrative remedies with respect to his dangerous conditions of confinement claims," but also concluding that inmate had failed to grieve from alleged denials of medical treatment occurring after the date of first grievance, so those claims were not exhausted), overruled on other grounds in part by Jones v. Bock, 549 U.S. 199 (2007).

## ANALYSIS

Because there are no genuine issues of material fact on the issue presented in the Defendants' motion for summary judgment, the issue of law presented therein is ripe for resolution.  The Court concludes that, by (i) informally notifying Defendants before he was attacked that he was wrongfully placed in a unit containing only gang members of a gang to which he did not belong; (ii) filing, after he was attacked, both his informal complaint stating that he had "been exposed to risk of bodily harm" by being falsely identified as a gang member and asking officials to "accept liability for their wrongful acts" and receiving a response that the warden was "investigating the [stabbing] incident" and to file a formal grievance; and (iii) filing his formal grievance again mentioning his previous warnings that he was falsely identified as a gang member and requesting that the Defendants "accept liability for their wrongful acts" and to "remove the status of suspected SNM member off of my STIU file," and listing the officers whom he had told about his wrongful placement; and (iv) completing the exhaustion process as instructed by the prison officials on the only relief the prison could give - reclassifying him and moving him from the unit with the gang members, Sanders exhausted his administrative remedies as to Count I (for deliberate indifference to a known risk of harm) and Count IV (for deliberately indifferent supervision, retention, and

training of officers).  The Court further concludes, however, that Sanders failed to exhaust his administrative remedies with respect to Counts II (deliberate indifference to serious medical-care needs) and III (official retaliation for the exercise of protected constitutional rights) because he failed to mention these conditions or any facts related to them in the complaint and grievance filed during the administrative process.

I.     **SANDERS' GRIEVANCE ENCOMPASSED HIS EIGHTH-AMENDMENT CLAIMS FOR DELIBERATE INDIFFERENCE AND HIS CLAIMS FOR SUPERVISORY LIABILITY.**

Although the Defendants concede that Sanders' grievance complaining, in part, about his classification has been completely exhausted, they contend that Sanders failed to exhaust his administrative remedies for Count I because his administrative complaint and grievance did not specifically "mention the November 12, 2006 attack or his injuries."  Motion for Summary Judgment at 3.  They contend that he did not exhaust Count IV because his grievance "did not mention staff supervision, retention and training, or describe it as negligent, deliberately indifferent or otherwise."  Id.  The Defendants further contend that Sanders failed to exhaust his administrative remedies because "Eighth Amendment violations were not identified as the subject of the grievance."  Motion for Summary Judgment at 13.  In support, Defendants rely on an unpublished 2004 case from the United States Court of Appeals for the Tenth Circuit:  McGee v. Fed. Bureau of Prisons, 118 Fed. Appx. 471, 2004 WL 2931365 (10th Cir. Dec. 20, 2004).  In McGee v. Federal Bureau of Prisons, the inmate contended that prison officials

> violated his Eighth Amendment rights by (a) falsifying documents classifying him as a member of the [Aryan Brotherhood] AB, (b) allowing this falsified information to reach other inmates, (c) housing him, both in general population and in some instances in the same cell, with inmates known to be a threat to him because of his classification as an AB member, (d) failing to take any steps to protect him after learning a "hit" had been placed on his life as a result of his classification as an AB member, (e) failing to protect him from an actual assault that occurred on March 21,

-16-

2003, and (f) failing to provide him with adequate medical care for the stab wounds he incurred during the March 21, 2003, assault.

McGee v. Fed. Bureau of Prisons, 118 Fed. Appx. at 474, 2004 WL 2931365, **2.  The Tenth Circuit examined the inmate's grievances, but it did not have the benefit of the binding Supreme-Court and subsequent Tenth-Circuit published opinions analyzing what level of detail is necessary to satisfy PLRA's exhaustion requirement.  The Tenth Circuit determined that,

> [i]n each of his three grievances, McGee asserted his classification as an AB member was wrong. In none of them, however, did he assert that prison officials (a) knowingly falsified his classification, (b) leaked his classification information to other inmates, (c) housed him with inmates known to be a threat to him, or (d) failed to take necessary steps to protect him from violence as a result of the classification. At best, McGee's second grievance (assigned case No. 268974-F1) stated the classification "needlessly endanger[ed] his life." ROA, Doc. 10 attachment. This assertion, however, was not sufficient in our view to alert prison officials to the existence of the Eighth Amendment violations alleged in McGee's complaint and amended complaint.  As for the Eighth Amendment claims pertaining to the March 21, 2003, assault and the alleged inadequate follow-up medical care for injuries sustained in that assault, McGee filed no administrative grievances. Indeed, all three official grievances predated the March 21, 2003, assault. Thus, we conclude the district court properly dismissed McGee's Eighth Amendment claims without prejudice due to his failure to exhaust administrative remedies.

118 Fed. Appx. at *476, 2004 WL 2931365, **3.  Obviously, a critical distinction between the McGee v. Federal Bureau of Prisons case and Sanders' case is that the inmate in McGee v. Federal Bureau of Prisons never filed a grievance after he was assaulted, while Sanders undisputedly filed his informal complaint and grievance after he was stabbed.  The Court further concludes, as Sanders' counsel urged at oral argument, that it must apply Supreme-Court and published Tenth-Circuit opinions which post-date McGee v. Federal Bureau of Prisons in resolving whether Sanders has sufficiently exhausted his remedies.  Sanders contends that "he used all available procedures to pursue grievances on grievable issues arising out of the 'incident' on November 12, 2006," and urges the Court to apply the principles in Jones v. Bock to determine what Sanders had to state in

-17-

his grievance to satisfy PLRA's exhaustion requirements.  Plaintiff's Response at 9 (quoting <u>Jones</u> <u>v. Bock</u>, 549 U.S. at 219, in support of Sanders' argument that "the exhaustion of administrative remedies does not include the requirement that prison grievances must effectively be 'a summons and complaint that initiates adversarial litigation.'").  The Court agrees that <u>Jones v. Bock</u> and its progeny are binding and begins, therefore, by determining what information the prison policies required Sanders to disclose in the grievance procedure and whether Sanders fully exhausted the remedies that were available to him.

The NMDOC required Sanders to name the "person to whom the complaint was filed against" on the Inmate Informal Complaint Form, and Sanders stated that it was filed against "Warden Heredia and Security Threat Intelligence Unit ("STIU") Administrator Joe Romero." Sanders' Informal Complaint at 1 (attached to Plaintiff's Response (Doc. 29) as Exhibit H). NMDOC policy required the inmate to use the form to "briefly summarize the complaint." CD 150501 ¶ A(5), at 2.  Under the NMDOC's definitions, a "grievance" is a "complaint" that addresses a "policy," a "condition," "or an incident occurring within an institution." CD-150500 at 2, ¶ F. Sanders summarized the "incident" that arose from a policy or condition as: "I've been exposed to risk of bodily harm since 1998 when I was falsely identified as a SNM Gang member."  Sanders' Inmate Complaint at 1.  That the Defendants understood that Sanders was also complaining about the recent stabbing incident is shown by Heredia's response that "the incident was still being investigated," and that a recommendation for Sanders' transfer was "pending."  <u>Id.</u> at 2.

As required by step three of the NMDOC's policy, Sanders next filed a formal "Inmate Grievance" using the appropriate grievance form.  <u>See</u> Sanders' Inmate Grievance (attached as Exhibit E to Motion for Summary Judgment).  This document required Sanders to "include documentation and names of any witnesses to support your claim," and to "state the relief

requested," id. at 1, which is consistent with the NMDOC's Policy requiring "grievances" (as opposed to "complaints") to "state what reasonable relief is being requested as a solution to any grievance," CD-150501 at 2, ¶ A (7).   Sanders again identified the wrongful acts he was complaining of: false identification as an SNM gang member; and his claim that he had "repeatedly . . . told the administration at SNMCF [and the STIU staff] that I am not a SNM gang member," and he attached the list of witnesses.  Sanders' Inmate Grievance at 1.  Sanders specifically named the STIU administrator who allegedly falsely identified him, and his witness list included wardens, supervisors, STIU staff, and prison guards whom he had told he was not a gang member and that he should not be placed with them.  See Sanders' Inmate Grievance at 1, 3.  Because Sanders could not, under NMDOC policy, grieve torts or receive money damages, he requested two forms of relief: for "the NMCD to accept liability for their wrongful acts" and for them to "remove the status of suspected SNM member off of my STIU file."  Sanders' Inmate Grievance at 1.  At this point, officials denied the grievance, and decided that Sanders would have to appeal from his classification so that he could seek the requested relief of a change in status, see id. at 2, which he did, see Sanders' Appeal of Level V or Level VI Placement, attached as Exhibit G to Plaintiff's Response. Upon the denial of that appeal, Sanders had completed exhaustion of his administrative remedies regarding the stabbing incident.

The Defendants' argument that he failed to exhaust because he did not specifically mention the attack or his injuries, to identify the Eighth-Amendment as the "subject" of his grievance, or to specifically raise the legal issue of supervisory liability is not persuasive.[3]  The grievance procedures

---

[3] Although specifically noting in their reply brief that "tort claims are not included within matters for which a prison inmate may file a grievance," the Defendants attempt to distinguish between "tort claims under the State's Tort Claims Act," which they agree may not be grieved, and "federal claims," including Sanders' Eighth-Amendment deliberate-indifference and creation-of-

do not require Sanders to state as the "subject" of a grievance the inmate's legal theories for which

he later may bring litigation; rather, they require him to "briefly" describe the policy, condition, or

incident that he is challenging.  Sanders referred to the stabbing incident by mentioning the fact that

he had been subjected to the "risk of bodily harm," for which the prison officials were "liab[le]" and

the informal complaint shows that the Warden was aware of, and fully investigated, the specific

stabbing incident about which Sanders was complaining.  Sanders complained about STIU staff not

responding to his complaints after he had "repeatedly told" them and their employees that Jaramillo

had falsely identified him as a gang member, and he listed as witnesses the officials and employees

whom he had told, as the policy requires.  See Sanders' Inmate Grievance at 1.  The prison policies

did not require him to discuss his tort theories and injuries, which could not be grieved.  See Jones

v. Bock, 549 U.S. at 218 (holding that the court had erroneously granted summary judgment to the

defendants on the exhaustion-of-remedies defense because it required information to be present in

a grievance of which the prison's policies made "no mention"); Howard v. Waide, 534 F.3d at 1244

(rejecting the defendants' contention that the inmate's Eighth-Amendment claim for deliberate

indifference was unexhausted "because he did not request monetary damages during the grievance

process. . . . [because] PLRA does not require a prisoner who otherwise complies with the grievance

process to add a futile request for a remedy that is, by the prison's own terms, unavailable").

---

harm claims, which they contend that an inmate must specifically mention in his grievance.  Reply
at 2.  Section 1983 however, provides a federal remedy for "tort claims" arising from constitutional
torts.  See Imbler v. Pachtman, 424 U.S. 409, 417 (1976)(noting that Section 1983 "creates a species
of tort liability," and must "be read in harmony with general principles of tort immunities and
defenses rather than in derogation of them"); Becker v. Kroll, 494 F.3d 904, 914 (10th Cir. 2007)("In
some instances, a common law tort is sufficiently analogous to the alleged constitutional violation
that its common law elements are grafted onto and themselves become elements of a § 1983
constitutional tort.").  Thus it is clear that § 1983 claims for constitutional torts are included, like
all "tort claims," within the matters "over which the Corrections Department has no control" and
therefore also are not grievable under CD-150500 at 2, ¶D(2)(a).

Sanders' complaint and grievance gave the prison all the information that the prison policies required.  He completed the full administrative appeals process, and there is no issue of timeliness. Because "one 'exhausts' processes, not forms of relief" under the PLRA, Booth v. Churner, 532 U.S. at 739, Sanders' "grievance will satisfy [PLRA's] exhaustion requirement so long as it is not so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally," Kikumura v. Osagie, 461 F.3d at 1283 (internal quotation marks omitted).  Sanders' complaint and grievance were not vague; the prison conducted a full investigation, and ruled on the classification and transfer issues.  Sanders was not required to make claims for money damages or raise specific constitutional or state-tort issues in his grievance, because they were not the proper subject of a grievance under NMDOC policy.   See CD-150500 at 6, ¶ D(2)(a) (stating that "tort claims" and other matters not under the NMDOC's control are "not grievable"); Casaus Depo. at 24-25 (attached as Exhibit A to Doc. 29, Plaintiff's Response to Motion for Summary Judgment). Because the prison "was unable to do anything more in response to" Sanders' grievance after it denied his classification appeal, because neither "money damages or any other retrospective relief was available through the prison's grievance process," Sanders "was required to do no more in order to exhaust his administrative remedies with respect to his dangerous conditions of confinement claims."  Ross v. County of Bernalillo, 365 F.3d at 1187.  The Court will deny summary judgment on Counts I and IV of Sanders' Complaint.

## II.   SANDERS' GRIEVANCE DID NOT ENCOMPASS HIS CLAIMS FOR DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL-CARE NEEDS OR FOR OFFICIAL RETALIATION FOR THE EXERCISE OF PROTECTED CONSTITUTIONAL RIGHTS.

In contrast, Sanders failed to mention in his prison complaint or grievance anything associated with his medical care after he was returned to SNMCF.  Nor did he make any allegations

that the motivation behind the false identification as a gang member was retaliation for having exercised his rights to appear as a witness, or to pursue lawsuits against the NMDOC or its employees.  Medical care and "perceived reprisal" or retaliation by "individual employee[s]" are both matters that may be grieved under NMDOC policy.  CD-150500 at 5, ¶ D(1)(a)(c).

Controlling precedent supports the proposition that an inmate does not exhaust his administrative remedies by filing a grievance which does not bring to the attention of prison officials the policy, conditions, or incidents that provide the basis for his claims.  See, e.g., Jones v. Bock, 549 U.S. at 219 (quoting language from the Fifth Circuit that "the primary purpose of a grievance is to alert prison officials to a problem"); Ross v. County of Bernalillo, 365 F.3d at 1184 (concluding that inmate  exhausted "his dangerous conditions claims by lodging a Pre-Grievance Resolution Form . . . [that] prison officials resolved . . . in his favor [thus] there was apparently no other administrative relief available, [and the inmate] was not required to follow up with a formal grievance," but concluding that the inmate "failed to exhaust his medical treatment claims because most of the conduct he now complains of took place after he filed the grievance alleging a lack of medical treatment. Accordingly, that conduct was never brought to the attention of prison officials through the grievance process.").  In Howard v. Waide, the Tenth Circuit affirmed the dismissal of one of an inmate's claims for failure to exhaust remedies and held that

> earlier grievances, which focused on risks to [the inmate's] safety in [another area of the prison] and his [request] for a transfer back to [a different section of the prison] where he thought he would be safe -- were not adequate to put prison officials on notice that he would be intimidated into participating in a scheme of financial fraud in [the area to which he had requested transfer] months later.

534 F.3d at 1245.

Because the record shows that Sanders did nothing to pursue administrative remedies pertaining to the medical treatment he received from prison officials following his return from the

hospital, and because he did not notify the SNMCF through the grievance process of his belief that officials were retaliating against him, they were not put on notice of, and could not investigate, those problems. See Jones v. Bock, 549 U.S. at 219. He, therefore, failed to exhaust his administrative remedies as to those two claims. See Howard v. Waide, 534 F.3d at 1245. The Court will grant summary judgment in favor of the Defendants on Counts II and III of Sanders' Complaint insofar as Sanders seeks relief under § 1983 for those claims.

**IT IS ORDERED** that Defendants' Motion for Summary Judgment is granted in part and denied in part, and that Sanders' claims for relief under § 1983 on Counts II and III are dismissed without prejudice for failure to exhaust administrative remedies.

_____
UNITED STATES DISTRICT JUDGE

_Counsel_:

Brian A. Pori
Inocenté, P.C.
Albuquerque, New Mexico

-- and –

Jacquelyn Robins
Albuquerque , New Mexico

    _Attorneys for the Plaintiff_

Ronald Gould
French & Associates, P.C.
Albuquerque, New Mexico

    _Attorneys for the Defendants_